

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

FILED
JUL 28 2008

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| SHARON FIRE CLOUD and WILMA WILSON, | CIV 06-3024 |
| Plaintiffs, | |
| -vs- | MEMORANDUM OPINION AND ORDER |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## INTRODUCTION

Plaintiffs brought claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680, arising out of two automobile accidents, which occurred on May 9, 2005, on Bureau of Indian Affairs ("BIA") Highway 10[1] within the exterior boundaries of the Lower Brule Sioux Indian Reservation ("Reservation") in South Dakota. Plaintiffs contend that their injuries and damages were proximately caused by the negligence of police officer Jason Driving Hawk ("Driving Hawk") when he took a driver of an abandoned vehicle into custody and then failed to remove the vehicle from the roadway. The government filed a motion for summary judgment (Doc. 29) premised on the contention that the plaintiffs' claims are not within the ambit of the FTCA and are barred by the doctrine of sovereign immunity.

## FACTS

Plaintiff Sharon Fire Cloud ("Fire Cloud") is a public involvement/grants coordinator for the Lower Brule Sioux Tribe ("Tribe") and resides on the Reservation in West Lower Brule, South Dakota, with her boyfriend, Bates Hood ("Hood"). Fire Cloud claims that she was physically injured in an automobile accident caused by the purported negligence of Driving

---

[1] Highway 10, federally-designated as the "Native American Scenic Byway," is a 101 mile long paved two-lane tourist route that runs from Chamberlain, South Dakota, to Fort Pierre, South Dakota.

Hawk. Plaintiff Wilma Wilson ("Wilson") is Fire Cloud's mother. Wilson was not personally involved in the accident although her vehicle was damaged. Wilson had loaned Fire Cloud her vehicle, a 1988 Oldsmobile Cutlass, because Fire Cloud's vehicle was not working.

Prior to this suit, plaintiffs filed an administrative claim with the United States Department of the Interior ("DOI"). By letter dated October 16, 2006, DOI denied the administrative claim, using the following language:

> "[t]he officer involved in the arrest of the individual whose car was parked on BIA Route 10 was a member of the Lower Brule Tribe Police Department. On May 9, 2005, no 638 contract existed for law enforcement services between the [BIA] and the [Tribe]."

## I. LAW ENFORCEMENT SERVICES ON THE RESERVATION

The Tribe, like other law enforcement agencies, has availed itself of federal grants to augment its law enforcement operations and services. One such grant the Tribe has utilized is the Community Oriented Policing Services ("COPS") Fast Grant Program. The COPS Fast Grant Program was originally authorized in the Violent Crime Control and Law Enforcement Act of 1994, PL 103-322, September 13, 1994, 108 Stat 1796, and is funded by the United States Department of Justice ("DOJ"). *See* 42 U.S.C. § 3796dd. These grants to local law enforcement agencies by the DOJ seek to encourage community policing by local governments. The DOJ defines community policing as "a policing philosophy that promotes and supports organizational strategies to address the causes and reduce the fear of crime and social disorder through problem-solving tactics and police-community partnerships." *See* United States Department of Justice Office of Community Orientated Policing Services, *available at* <http://www.cops.usdoj.gov/Default.asp?Item=36> (Last Visited: June 21, 2008).

In January 1999, the Lower Brule Police Department ("LBPD") received COPS Fast Grant monies and used them to fund an officer position in conjunction with funds provided by the Tribe. Driving Hawk was the officer hired with these monies.

The Tribe and the BIA Office of Law Enforcement Services ("BIA-OLES") are responsible for the provision of law enforcement services on the Reservation. The relationship between the two entities, for the most part, has been informal because they have not entered into an Indian Self-Determination and Education Assistance Act Contract ("638 Contract"), PL

93-638, or an agreement under the authority of the Indian Law Enforcement Reform Act, 25 U.S.C. §§ 2801-2909. However, for a short time period in 1998, the two entities formalized some aspects of their relationship by executing a Memorandum of Agreement ("MOA"). As part of this MOA, BIA-OLES agreed to: (1) conduct pre-employment background investigations; (2) provide on-the-job training; and (3) provide supervision of COPS grant officers employed by the Tribe, including setting shift schedules, making duty assignments, and forwarding leave requests "pursuant to the Tribe's personnel procedures."

When this initial MOA expired, in October 2001, a similar MOA was executed and remained in effect until November 1, 2002. The 2001 MOA contained the following language:

> [n]othing in this Agreement shall be construed to cede any jurisdiction, to waive any immunities, to modify the legal rights of any person, to accomplish any act violative of federal state or tribal law so as to subject the parties, jointly or severally to any liability that they would not be subject to absent this [MOA].

After the 2001 MOA expired, no further MOAs were executed. Even though the entities never executed another MOA, BIA and Tribal personnel continued to operate in a virtually identical manner as they had under the previous MOAs.

## II. THE ACCIDENT

On May 9, 2005, BIA Dispatcher Dianne Michalek ("Michalek"), a federal employee, and Driving Hawk were assigned to work the midnight to 8:00 a.m. shift. They were the only officers on duty during that shift. At approximately 6:34 a.m., Ramona Grassrope ("Grassrope") phoned dispatcher Michalek and reported that Sherrie Hawthorne ("Hawthorne") was in a little red vehicle and was harassing her. Driving Hawk responded to Grassrope's residence but when he arrived, he did not find Hawthorne or the red vehicle.

At 7:12 a.m., Driving Hawk located the red car. He found the car stopped in the east bound lane of Highway 10. Driving Hawk checked the car and noticed that it was empty and locked. As he drove some distance from the vehicle, Driving Hawk observed a female running in the field. He stopped his vehicle and reported his observation to the dispatcher. At 7:17 a.m., BIA dispatcher Medicine Crow, who was scheduled to work after Michalek's shift, radioed police dispatch and asked Michalek whether she had received a report of an abandoned vehicle

3

on the road. Michalek advised Medicine Crow that Driving Hawk was "on scene."

Driving Hawk pursued the female on foot until he caught up with her. Hawthorne told Driving Hawk that the car on the road was hers and that the vehicle was out of gas. Hawthorne gave her vehicle keys to Driving Hawk. Driving Hawk escorted her to the police unit, placed her in the back seat, and administered a breath test on her. The breath test registered a 0.17 BAC - blood alcohol content. Driving Hawk placed her in custody and then drove to where the red car was stopped, parked his vehicle behind it, and used the keys to gain access to the vehicle. Driving Hawk attempted to start the car, but it did not start.

At 7:25 a.m., Jason Rouillard ("Rouillard") telephoned BIA dispatch and reported that a car was sitting in the east bound lane of Highway 10, just outside of Lower Brule. He told dispatch that he "almost smoked" the car and he asked jokingly whether he should push it off the road. Michalek advised him that he could and that an officer was trying to locate the vehicle's owner. A minute later, Driving Hawk informed dispatch that he had placed a female in custody for public intoxication with Breathalyzer reading of 0.17 BAC. He further advised dispatch that he had the keys to the vehicle and would deal with the car when he got back. Michalek has stated that she could hear a female "hollering and cussing" over the radio.

Over the next thirty minutes, several other motorists contacted the police department and informed them about the abandoned car. There is no evidence that any BIA employee told Driving Hawk that other drivers coming upon the stalled vehicle had complained about the dangerous condition. A genuine issue exists as to whether the BIA employee had a legal responsibility to do so and failed to do so.

At approximately 8:00 a.m., Hood and Fire Cloud were travelling on Highway 10 on their way to work, with Hood driving. Testimony differs about the weather and road conditions before the accident. Driving Hawk has stated that it was daylight and cloudy, but not raining. Further, he stated he had no trouble seeing the vehicle and he noticed no obstructions. Conversely, Hood and Fire Cloud testified that the weather was overcast, with light fog and rain. They also said that their windshield wipers were in use and that the roads were slippery from the moisture. As they were approaching the car, both Fire Cloud and Hood said they thought it was moving. Fire Cloud said she realized that the car was not moving about 20 seconds before Hood crashed into

it. Further, she said, "I knew we was (sic) going to hit that car." Hood stated by the time that he realized the car was not moving, all he could do was attempt to swerve right towards the ditch because, on the left hand side, a garbage truck was approaching in the on-coming traffic lane. Instead of steering to the right, as intended, Hood stated the tires slid on the wet pavement and he was unable to avoid the parked car.

After impact, Fire Cloud hit her head on the windshield and thought to herself "that wasn't so bad." Seconds later, a van driven by Renee Peterson smashed into the back of Wilson's car, propelling it forward into Hawthorne's abandoned car. These impacts threw Fire Cloud sideways into the dashboard, fracturing her right humerus and into the rear view mirror and the windshield, cracking the windshield and injuring her head. Her fractured right humerus required surgery and she was unable to go back to work for approximately two months. Hood fortunately was uninjured.

Driving Hawk was again the first officer on the scene. While on scene and while checking on the crash victims, he noticed that Hood had bloodshot eyes and administered two separate breath tests. Each test registered a 0.06 BAC.

## DISCUSSION

### I.   STANDARD OF REVIEW

The summary judgment standard is well known and has been set forth by this court in numerous opinions. *See* Hanson v. North Star Mutual Insurance Co., 1999 DSD 34 ¶ 8, 71 F.Supp.2d 1007, 1009-1010 (D.S.D. 1999), Gardner v. Trip County, 1998 DSD 38 ¶ 8, 66 F.Supp.2d 1094, 1098 (D.S.D. 1998), Patterson Farm, Inc. v. City of Britton, 1998 DSD 34 ¶ 7, 22 F.Supp.2d 1085, 1088-89 (D.S.D. 1998), and Smith v. Horton Industries, 1998 DSD 26 ¶ 2, 17 F.Supp.2d 1094, 1095 (D.S.D. 1998). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R. Civ.P. 56(c); Donaho v. FMC Corporation, 74 F.3d 894, 898 (8th Cir. 1996). The United States Supreme Court has held that:

> The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof

at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "A material fact dispute is genuine if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." Landon v. Northwest Airlines, Inc., 72 F.3d 620, 634 (8th Cir. 1995). "[T]he burden on the moving party may be discharged by 'showing'– that is, pointing out to the district court– that there is an absence of evidence to support the nonmoving party's case." Celotex Corporation v. Catrett, 477 U.S. at 325. Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. In considering the motion for summary judgment, this Court must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. Donaho, 74 F.3d at 897-98. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

II. **FTCA CLAIMS**

    A. **EMPLOYEE OF THE GOVERNMENT**

The FTCA waives sovereign immunity for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The term "employee of the government" for the purposes of the FTCA includes "officers or employees of any federal agency . . . and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation," but excludes independent contractors. 28 U.S.C. § 2671. To ascertain whether an individual is an employee or contractor

within the ambit of the FTCA, the court must consider the extent to which the federal government has the power to supervise the individual's day-to-day operations. United States v. Orleans, 425 U.S. 807, 814, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). Crucial to this analysis is the amount of control exercised by the government over the physical performance of the individual. *Id.* at 814-815, Logue v. United States, 412 U.S. 521, 527-528, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973) *(relying upon* Restatement (Second) of Agency § 2 (1958)), and Charlima, Inc. v. United States, 873 F.2d 1078, 1080-81 (8th Cir. 1989).

In this action, plaintiffs allege that Driving Hawk committed a negligent act by failing to remove an abandoned vehicle from the highway after taking the driver into custody, and seek to hold the government liable for that alleged negligent act. This is apart from any question as to the responsibilities of the BIA dispatcher. To substantiate this claim, plaintiffs advance several arguments why the degree of supervision and control exercised by the BIA was sufficient to convert Driving Hawk into a governmental employee. First, they maintain that several facts substantiate a finding of supervisory power. These important facts are: (1) BIA Police Chief, James Two Bulls, letter to Dr. Magnus referring to officer Driving Hawk as "our employee" and requesting that he perform a physical examination on Driving Hawk; (2) Chief Two Bulls' October 26, 2001, directive instituting a chain of command that included tribal officers, including Driving Hawk; (3) deposition testimony corroborating the fact and interdepartmental understanding that the BIA exercised full supervisory authority over tribal officers; and (4) supervisory officers were never hired by the tribe. Second, the expired MOA between the BIA and the Tribe conferred BIA supervisory authority over tribal officers hired under the COPS Program, including Driving Hawk.

Conversely, defendant contends the nature and the degree of supervision and control exercised by the BIA does not support a finding of supervisory power sufficient to convert Driving Hawk into a governmental employee. First, concerning the nature of the relationship, defendant characterizes the relationship between the BIA and the Tribe as informal, noting that the BIA acts only in an oversight capacity and has no contract in force with the Tribe. Further, a prerequisite for the Tribe's receipt of any COPS Fast Grant monies was the agreement that the Tribe retain and fund the officers once the grant funds ran out. In other words, the purpose of the

7

COPS Fast Grant Program was intended to increase the number of tribal officers, not the number of BIA officers. Also, Congressional intent has been to strengthen tribal sovereignty, placing more authority and control over government programs with the tribes. Second, concerning the degree of supervision, defendant emphasizes that no contract was in force between the BIA and the Tribe, so that the BIA had no authority to control the detailed performance of the tribal officers. Also, defendant argues that all personnel matters involving COPS officers were controlled by the Tribe, such as (1) the Tribe retained the right of selection, or to employ at will, (2) the Tribe was responsible for payment of wages and benefits, (3) the Tribe retained the right to discharge or terminate the relationship with the COPS program, (4) after the MOA expired, the Tribe retained the right to supervise and manage its COPS officers, and (5) the work performed benefitted the Tribe. Finally, defendant argues that Driving Hawk worked independently and enforced tribal law only. These last two claims are disputed and at issue.

After thorough consideration and review, the Court finds that genuine issues of material fact predominate and, therefore, summary judgment is not appropriate. Here, the cooperation between the BIA and the LBPD is extensive, i.e. providing direct supervision and training, and working in concert. This relationship alone may transform LBPD officers into federal employees. Further, the defendant's claim that Driving Hawk worked independently and enforced only tribal law is dubious. The fact that the only supervisors Driving Hawk had were BIA officials is very telling. Are we to assume that an officer "on the beat" would be working without supervision? The defendant's supposition also overlooks the fact that Driving Hawk was regularly assigned duties by BIA officials. This may include the dispatcher. Finally, while no agreement, MOA or otherwise, between the BIA and the Tribe was in force, these agreements exhibited a course of dealing. This course of dealing, which appears to be the same or similar after the MOAs lapsed, may be sufficient evidence of supervision and control to find that Driving Hawk is a de facto government employee. At a minimum, this course of dealing presents a genuine issue of material fact as to the degree of supervision and control exercised by the government. Because genuine issues of material fact exist as to whether Driving Hawk is a governmental employee, the defendant's motion for summary judgment on this ground should be denied. However, this determination does not end the Court's inquiry because the defendant

raises two additional issues: the public duty doctrine and the discretionary function exception.

### B.   PUBLIC DUTY DOCTRINE

The "public duty doctrine" provides that when the "government owes a duty of protection to the public, not to particular persons or classes[,]" a governmental entity cannot be held liable to an individual for damages. Tipton v. Town of Tabor, 567 NW2d 351, 356 (SD 1997). "The focus of public duty doctrine is on the nature of the duty created, whether it is a duty to the general public or to the particular individual." Boyle v. City of Liberty, Mo., 833 F.Supp. 1436, 1441 (W.D.Mo. 1993). The existence of such a duty is determined by the court as a matter of law. Gilbert v. United Nat'l Bank, 436 NW2d 23, 27 (S.D. 1989). Additionally, the South Dakota Supreme Court has limited the applicability of this doctrine to situations involving law enforcement. E.P. v. Riley, 604 NW2d 7, 13 (S.D. 1999).

The public policy rationale for this doctrine is summarized in 18 E. McQuillin, The Law of Municipal Corporations § 53.04.25, at p. 199 (3rd ed. 2003) (footnotes omitted):

> Courts give several reasons for the rule. First, it is impractical to require a public official charged with enforcement or inspection duties to be responsible for every infraction of the law. Second, government should be able to enact laws for the protection of the public without exposing the taxpayers to open-ended and potentially crushing liability from its attempts to enforce them. Third, exposure to liability for failure to adequately enforce laws designed to protect everyone will discourage municipalities from passing such laws in the first place. Fourth, exposure to liability would make avoidance of liability rather than promotion of the general welfare the prime concern for municipal planners and policymakers. Fifth, the public duty rule, in conjunction with the special relationship exception, is a useful analytical tool to determine whether the government owed an enforceable duty to an individual claimant.

The doctrine also "acknowledges that many 'enactments and regulations are intended only for the purpose of securing to individuals the enjoyment of rights and privileges to which they are entitled as members of the public, rather than for the purpose of protecting any individual from harm.'" Restatement (Second) of Torts § 288 cmt. c (1965).

Although this doctrine has been confined to law enforcement situations, the doctrine will be set aside when a special relationship or duty is owed to a particular individual. The Court

9

considers four factors in determining whether a special relationship or duty exists that abrogates the public duty doctrine. Louttit v. City of Deadwood, 2007 WL 185091 (D.S.D. 2007) (unreported) (citing *E.P. v. Riley*, 604 NW2d 7, 12-13 (S.D. 1999)). *See also* Walther v. KPKA Meadowlands Ltd. P'ship, 581 NW2d 527, 533 (S.D. 1998). These factors include: (1) the governmental entity's actual knowledge of the dangerous condition; (2) reasonable reliance by a person on the governmental entity's representations and conduct; (3) an ordinance or statute that sets forth mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole; and (4) failure by the governmental entity to use due care to avoid increasing the risk of harm. *Id.* "To establish the existence of a special relationship, plaintiff must prove actual knowledge and at least one other factor." *Id.* (citing Walther, 581 NW2d at 533). "[A]ctual knowledge denotes a foreseeable plaintiff with a foreseeable injury." Tipton, 567 NW2d at 359.

     Turning to the matter at hand, the first question is whether the public duty doctrine applies in this instance. Plaintiffs argue that it does not. First, they claim, under South Dakota law, Driving Hawk committed a negligent act by failing to remove the abandoned vehicle from the road or by adequately warning others of the hazard. Plaintiffs list alternative conduct that Driving Hawk could have taken to remove or warn others of the hazard, such as: (1) place flares or other warning devices (which he had in his vehicle) to warn of the presence of the disabled vehicle; (2) place his patrol car, with lights and flashers operating, in a location that would advise oncoming traffic of the disabled vehicle; (3) direct traffic safely around the disabled vehicle; (4) remove the disabled vehicle; (5) follow police procedure; (6) radio for assistance; and (7) call the driver's relatives or family members to get the car. Second, plaintiffs argue the public duty doctrine does not apply in case of ordinary negligence by government employees or in cases where a government employee negligently handles or manages a motor vehicle after it is in his exclusive custody or control. Plaintiffs emphasize that Driving Hawk took exclusive control of the car and the car keys at the time of arrest.

     The plaintiffs are correct that the public duty doctrine is not applicable in this case. South Dakota law places an obligation on citizens to remove their stalled vehicles or any other obstructions from the highway or road or to warn others of the hazard until it can be removed.

Runge v. Prairie States Ins. of Sioux Falls, 393 NW2d 538, 540 (S.D. 1986) (citing cases). *See also* SDCL 32-30-1, 2, and 4, SDCL 31-32-6. South Dakota also places obligations on law enforcement officials with respect to vehicles left on a highway or road. SDCL 32-30-3 provides:

> If any peace officer finds a vehicle standing upon a highway in violation of the provisions of § 32-30-1, 32-30-2, or 32-30-4, he may move the vehicle or require the driver or person in charge of the vehicle to move the vehicle to a position permitted under said sections.

In addition, SDCL 32-30-19 provides:

> Any police officer may remove or cause to be removed to the nearest garage or other place of safety any vehicle found upon a highway when a report has been made that the vehicle has been stolen or taken without the consent of its owner, when the person or persons in charge of the vehicle are unable to provide for its custody or removal, or when the person driving or in control of the vehicle is arrested for an alleged offense for which the officer is required by law to take the person arrested before a judge or magistrate without unnecessary delay.

At the very least, Driving Hawk owed a duty to other users of the public highway to remove the abandoned vehicle or warn others of the hazzard. Consequently, the public duty doctrine does not shield Driving Hawk's alleged negligence.

The special relationship exception is also applicable to this case because public highway users are a special class. In addition, at least two of the required elements for this exception are met: (1) actual knowledge and (2) failure to use due care to avoid increasing the risk of harm. First, Driving Hawk as an ordinary citizen, let alone as a police officer, would undoubtedly know that leaving an abandoned vehicle in the driving lane of a public highway without any type of warning to oncoming motorists is a dangerous condition. As a result, Driving Hawk is charged with possessing actual knowledge. Second, Driving Hawk increased the risk of harm when he took possession of the car keys, which prevented others from being able to move the car, and when he left the scene without providing any type warning to oncoming motorists. Certainly, there was no emergency requiring him to leave the scene. Accordingly, the Court finds that the public duty doctrine does not apply and that defendant's motion for summary judgment on this

ground should be denied.

### C. DISCRETIONARY FUNCTION EXCEPTION

The discretionary function exception, 28 U.S.C. § 2680(a), is another exception to the limited waiver of sovereign immunity set forth in the FTCA. If an alleged act falls within the discretionary function exception, a court is without subject matter jurisdiction, Dykstra v. U.S. Bureau of Prisons, 140 F.3d 791, 795 (8th Cir. 1998), and dismissal of the claim is warranted. Id. at 797.

The discretionary function exception applies to:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or a regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). "The burden of proving subject matter jurisdiction falls on the plaintiff." V S Ltd. Partnership v. Department of Housing and Urban Development, 235 F.3d 1109, 1112 (8th Cir. 2000). Consequently, in the case at bar, plaintiffs have the burden to prove that the acts complained of fall outside the discretionary function exception. See Goldsby v. Sullivan, 735 F.2d 302, 303 (8th Cir. 1984).

In determining if the activity of the government is discretionary, the United States Supreme Court has provided two guiding principles to assist the lower courts. Berkovitz v. United States, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958 (1988).

> First, the alleged action must be a matter of choice for the acting employee. Id. "[I]f the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect." Id. at 536, 108 S.Ct. at 1959. Therefore, in order for the discretionary function exception to apply, the government employee must have made a choice.
>
> The second guiding principle requires a court to determine whether the choice is of the kind that the discretionary exception was designed to shield. Id. This inquiry reflects the policy of Congress "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in

> tort." United States v. Varig Airlines, 467 U.S. 797, 814, 104 S. Ct. 2755, 2765 (1984). When engaging in this second inquiry, a court is to determine whether the judgment is grounded in social, economic, or political policy, and, if the choice is based on such policy considerations, then the discretionary exception will bar the claim. Dykstra, 140 F.3d at 795. The discretionary exception only insulates the federal government from liability in cases where a government employee makes a decision based upon considerations of public policy. Berkovitz, 486 U.S. at 537, 108 S. Ct. at 1959.
>
> In United States v. Gaubert, 499 U.S. 315, 111 S.Ct. 1267, 1274-1275 (1991), the United States Supreme Court reiterated its conclusion that the discretionary function exception only applies when a decision has been made that is the result of public policy considerations. Dykstra, 140 F.3d at 795. At a very minimum, therefore, a governmental employee must actually make a decision, a decision that comes after the employee took into account some aspect of public policy. If no decision was made, or the decision was not predicated upon public policy, then the discretionary function exception does not apply. See Gaubert, 499 U.S. at 322, 111 S.Ct. at 1273; Berkovitz, 486 U.S. at 536-537, 108 S.Ct. at 1958-1959; Varig Airlines, 467 U.S. at 811, 104 S.Ct. at 2763; Dykstra, 140 F.3d at 795; Tonelli, 60 F.3d at 496.

Locke v. United States, 2002 D.S.D. 22 ¶¶ 27-29, 215 F.Supp.2d 1033, 1045.

Justice Scalia, writing in a concurring opinion in United States v. Gaubert, 499 U.S. at 335, 111 S.Ct. at 1289, noted the difficulty lower courts have in applying the "policy judgment" test for determining whether governmental actions are shielded by the discretionary function exception. The Supreme Court in Gaubert analyzed applicable precedents and summarized them as follows:

> [I]f a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation. If the employee violates the mandatory regulation, there will be no shelter from liability because there is not room for choice and the action will be contrary to policy. On the other hand, if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.

Gaubert, 499 U.S. at 324, 111 S.Ct. at 1274 (internal citations omitted). "When established

governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Id. Thus, discretionary acts are not confined to those acting at the policy level but may apply to those acting at the "operational" or "management" level. Gaubert, 499 U.S. at 325-26, 111 S.Ct. at 1275.

Plaintiffs in this case contend that officer Driving Hawk's decision not to remove the vehicle from the roadway is a ministerial act which is not shielded by the discretionary function exception. While it is true that the plaintiffs can point to no mandatory policy or South Dakota statute absolutely requiring police officers to remove vehicles from the roadway, South Dakota statutes require ordinary citizens to remove abandoned vehicles from the roadway or to provide a warning to oncoming motorists. These statutes are sufficient to remove officer discretion and create a ministerial duty. Additionally, even though officers frequently have to juggle competing concerns when performing their duties, public safety takes precedence. Failing to remove an abandoned vehicle from the roadway or failing to provide warning to oncoming motorists creates grave public safety concerns. Accordingly, the defendant's motion for summary judgment on this ground should be denied.

## ORDER

Based upon the foregoing,

IT IS ORDERED that the defendant's motion for summary judgment (Doc. 29) is denied.

Dated this 28th day of July, 2008.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:

JOSEPH HAAS, CLERK

BY: _____
    DEPUTY
(SEAL)